IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| COLE BORCHARDT,<br><br>Plaintiff,<br><br>vs.<br><br>ERICA WAHL, ERIC FENDLER, MARSHA FENDLER, SARAH FENDLER, and THERESA OHL,<br><br>Defendants. | CV 24-199-BU-KLD<br><br>ORDER |

This case comes before the Court on Defendants Erica Wahl, Eric Fendler, Marsha Fendler, Sarah Fendler and Theresa Ohl's motion for summary judgment (Doc. 59) and Plaintiff Cole Borchardt's motion for discovery sanctions (Doc. 75). The Court heard oral argument on both motions on May 29, 2026. For the reasons discussed below, both motions are granted in part and denied in part.

## I. Factual Background

This case arises from lengthy and acrimonious family law litigation largely concerning disputes relating to the custody of children born of the marriage of Plaintiff Cole Borchardt and Defendant Erica Wahl, specifically WB and AB. Defendants Eric Fendler and Marsha Fendler are Erica Wahl's parents, Defendant

Sarah Fendler is Erica's sister-in-law, and Defendant Theresa Ohl is Erica's sister.[1] Wahl and Borchardt were married in October 2007 and divorced on June 20, 2017. (Doc. 8 at 3). Wahl had initiated the divorce in Montana as a legal separation in 2015, but then converted the separation to a dissolution proceeding in March 2016. (Doc. 8 at 3).

Although the claims in this case arise from legal proceedings in 2022 and 2023, the factual underpinnings of those proceedings began much earlier. The Defendants in this case alleged that both WB and AB, as well as other children in the Fendler extended family, disclosed to teachers, counselors and law enforcement officers that they had been physically and sexually abused by Borchardt over a period of years. (Doc. 60-1 at ¶ 2). Wahl alleged that in 2014, she awoke to the sound of crying from WB's bedroom, and saw Borchardt in bed with WB. (Doc. 60-1 at ¶ 3). She further alleged that WB later told her that Borchardt had pulled on his genitals while in bed, and that in 2015 she observed Borchardt with his hand in the front of WB's underwear. (Doc. 60-1 at ¶¶ 3 and 4). Later that same year, Dr. Christine Mitchell testified in Gallatin County District Court that WB disclosed that Borchardt hit him frequently and that he was afraid of him. (Doc. 60-1 at ¶ 5).

---

[1] For ease of reference, the Court will use the Defendants' first names where appropriate.

In 2016, AB twice disclosed to Marsha Fendler, Erica Wahl's mother, that Borchardt had touched her "private parts," and Marsha reported these disclosures to Child Protective Services. (Doc. 60-2 at ¶ 2). Also in 2016, Marsha allegedly saw AB and WB naked with WB's head near AB's pelvic area. (Doc. 60-2 at ¶ 4). Although she did not state why, Marsha believed it was the second time WB had exhibited that type of behavior toward AB. (Doc. 60-2 at ¶ 4). Shortly after this incident, WB and AB disclosed that Borchardt had inappropriate and/or abusive contact with them to a mental health counselor. (Doc. 60-1 at ¶ 6). That counselor discussed this disclosure with Wahl, and also stated the disclosures had been reported to Child Protective Services. (Doc. 60-1 at ¶ 6).

At some point, WB also disclosed to one of his teachers, Laura Veele, that Borchardt had touched his private parts and that Borchardt had physically hurt WB and AB. (Doc. 60-1 at ¶ 7). This allegation was investigated by Dan Mayland of the Gallatin County Sheriff's Office. (Doc. 73-9). Veele, who was actually a school counselor, disclosed detailed notes of her interactions with WB and it was decided that a forensic interview would be conducted. (Doc. 73-9 at 7). The case ultimately was closed as "information only." (Doc. 73-9 at 7).

Separate from the allegations made relating to children born of the Borchardt/Wahl marriage, additional allegations of physical and sexual abuse were made during this same time period relating to children of Wahl's sisters, Elaine

Henry and Theresa Ohl. (Docs. 60-2, 60-3 and 60-5). In April 2021, Gallatin County Sheriff's Detective Colter Metcalf, while investigating allegations of sexual abuse by Borchardt against one of Elaine Henry's children (BH), researched the prior reported allegations of abuse by Borchardt noted above. (Doc. 60-8). Wahl was interviewed as part of that process, as well as both AB and WB. Neither child made disclosures of sexual abuse by Borchardt, although Wahl recounted her prior observations. As a result of his investigation, Detective Metcalf recommended charges against Borchardt for incidents involving children other than AB and WB. (Doc. 60-8 at 8). The Gallatin County Attorney's office declined prosecution.

On April 5, 2022, WB was interviewed by Dr. Cynthia Brewer, a board certified family medicine physician who, at the time relevant to this case, spent approximately half of her time working on cases involving child physical and sexual abuse and neglect. (Doc. 73-7 at 8 (61: 15-25)). At the time of the interview, WB was accompanied by his mother Erica Wahl and his aunt Sarah Fendler. (Doc. 73-7 at 9 (62: 12-15)). Dr. Brewer's recollection was that the appointment was made by one of WB's aunts, who told the nurse that they had been referred to Dr. Brewer by the Bridger Police Department. (Doc. 73-7 at 9 (62: 18-25)). However, it was later determined that the Bridger Police Department had not referred WB;

instead, the family just called the office to schedule the appointment, which Dr. Brewer noted as "[n]ot very common at all." (Doc. 73-7 at 10 (63: 5-18)).

Dr. Brewer noted that, in response to her inquiry about why he was there to see her, WB responded "we're trying to make Cole go to jail because he deserves it." (Doc. 73-7 at 11-12 (64: 16-65: 5)). Ultimately, Dr. Brewer determined she could not make any conclusion about whether sexual abuse had occurred because of the level of coaching that had happened. (Doc. 73-7 at 13 (66: 2-7)). She stated that she "would not be able to prove or disprove child abuse because of how the adults manipulated the situation." (Doc. 73-7 at 14 (67: 17-20)). Brewer did not specify who she believed had coached the children.

Against this backdrop, Wahl and Borchardt continued the legal battle over the custody of their children. Several of these skirmishes form the basis of the current dispute. On Saturday, April 9, 2022, Wahl and Borchardt reached a stipulated agreement regarding "outstanding issues" and allowing Borchardt parenting time with at least one of his children. (Doc. 8-1 at 1). However, on April 10, 2022, Sarah Fendler filed a Sworn Petition for Temporary Order of Protection and Request for Hearing with the Bridger City Court, alleging Borchardt physically and sexually abused WB, with the most recent physical abuse having occurred in August 2021. (Doc. 8-2 at 3-4). The Petition did state that there was a parenting plan, but did not specify whether the family law case was still pending. (Doc. 8-2

at 5). The Bridger Municipal Judge temporarily granted a Temporary Order of Protection ("TOP") prohibiting Borchardt from contacting his children on that same day, and set a hearing for April 29, 2022. (Doc. 8-3 at 4). The TOP noted that there were no other pending actions, although a parenting plan "may exist." (Doc. 8-3 at 3). Sarah Fendler applied for a similar TOP for AB, alleging she had observed WB being beaten, and the Court granted the same. (Docs. 8-4 and 8-5).

On May 25, 2022, Standing Master Magdalena Bowen of the Montana Eighteenth Judicial District issued an order dismissing the TOPs, noting first that it was in jurisdiction over the Petitions and then dismissing both TOPs. (Doc. 8-6 at 2). At that hearing, Wahl was represented by attorney Jeannette Berry, Cole Borchardt was represented by his current counsel, Erin Melsheimer, and Sarah Fendler was not represented. The children were individually represented by Guardian ad Litem Juli Pierce, who had previously been appointed by the Municipal Court. (Doc. 8-6 at 1-2). The order further specified that the parents, Wahl and Borchardt, were to parent in accordance with the provisions of the parenting plan in the dissolution case. (Doc. 8-6 at 2).

On December 23, 2022, Wahl filed a Sworn Petition for Temporary Order of Protection and Request for Hearing in Broadwater County Justice Court, seeking protection for AB who had recently disclosed alleged sexual abuse by Borchardt. (Doc. 8-7 at 4). AB was scheduled to go to Borchardt's home in Wyoming from

December 26 through January 1, and Wahl stated the Petition for the TOP was filed to allow the investigation into the current allegation to be completed. (Doc. 8-7 at 4). The request was supported by a letter addressed to Wahl's attorney, KC Barrett, from AB's counselor, Natalie Koziarski, who stated AB had disclosed sexual abuse during a clinical assessment on December 12, 2022 (Doc. 8-7 at 5). In her Petition, Wahl inaccurately noted that the dissolution proceeding was concluded. (Doc. 8-7 at 7). The TOP was granted on December 23, 2022 by Broadwater County Justice of the Peace Kirk Flynn, who set a hearing for January 11, 2023. (Doc. 8-8). On that same day, in the dissolution case, Wahl (through her attorney KC Barrett), filed an Emergency Motion to Adopt Petitioner's Proposed Amended Parenting Plan as an Interim Parenting Plan, recounting the recent allegations of abuse made by AB and seeking to suspend Borchardt's visitation and contact with AB. (Doc. 8-10).

On December 27, 2022, Borchardt filed a motion with the Justice Court seeking removal of the Petition to the District Court, which was granted. Standing Master Bowen held a hearing on February 17, 2023, at which Wahl was represented by KC Barrett and Borchardt was represented by Erin Melsheimer. (Doc. 8-9). Standing Master Bowen again dismissed the TOP preventing Borchardt from visiting with his child. On April 7, 2023, Barrett filed a motion to change venue on Wahl's behalf, arguing that venue in Gallatin County was improper because

neither Wahl nor Borchardt lived in Gallatin County any longer, and Gallatin County law enforcement was refusing to investigate AB's sexual abuse allegations because she lived in Broadwater County. (Doc. 8-11 at 1-2). Standing Master Bowen denied that motion, finding that the objection to venue was waived. (Doc. 8-12).

On July 17, 2024, Standing Master Bowen found Wahl in contempt of Court for not delivering AB for summer parenting time on June 8, 2024 and for "intentionally frustrating [Borchardt's] parenting time in violation of this Court's Order." (Doc. 8-1 at 8). During this time period, Wahl was represented by Marta Farmer and Eric Peabody. (Doc. 8-1 at 9). Standing Master Bowen found that Wahl had engaged in vexatious litigation which frustrated Borchardt's parenting time, and ordered her to pay Borchardt's reasonable attorney fees and costs incurred on or after June 8, 2024. (Doc. 8-1 at 8-9).

Borchardt initially filed his complaint in state court on November 24, 2024, and it was removed to federal court on December 19, 2024. (Doc. 1 and 1-1 at 6-16). On January 9, 2025, Borchardt filed his first amended complaint and demand for jury trial, alleging five causes of action:

Count 1: Malicious Prosecution based on Sarah Fendler's April 10, 2022 and April 14, 2022 TOP petitions to Bridger City Court;

Count 2: Malicious Prosecution based on Erica Wahl's December 23, 2022 TOP petition to Broadwater County Justice Court;

Count 3: Abuse of Process based on Erica Wahl's December 23, 2022 TOP petition to Broadwater County Justice Court;

Count 4: Malicious Prosecution based on Erica Wahl's December 23, 2022 emergency motion to adopt her proposed amended parenting plan as an interim parenting plan;

Count 5: Abuse of Process based on Erica Wahl's April 7, 2023 motion to change venue; [2]

Count 6: Intentional Infliction of Emotional Distress based on the filing of the above-referenced documents; and

Count 7: Negligent Infliction of Emotional Distress based on the above-referenced documents.

The remaining abuse of process claim (Count 3) is alleged solely against Wahl. Although there are no allegations that Eric Fendler, Marsha Fendler or Theresa Ohl actually filed any of the legal documents giving rise to the malicious prosecution claims, each of the claims state that "Defendants collectively were responsible for instigating, prosecuting and continuing" the proceedings. (Doc. 8 at ¶¶ 48, 58, and 74). Similarly, Counts 6 and 7 as to Eric, Marsha and Theresa are based on "instigating, prosecuting and continuing" the legal processes set in motion by the filings of the documents. (Doc. 8 at ¶¶ 90, 91, 93, 100, 101 and 103).

[2] During the May 29, 2026 argument, the Court granted Borchardt's motion to dismiss Count 5 with prejudice. As such, Count 5 will not be discussed in this order.

Marsha Fendler, Wahl's mother, alleged that multiple children, including WB and AB as well as BH and RO, disclosed ongoing sexual abuse by Borchardt. (Doc. 73-3 at 12-43). When asked about her interactions with Keeley McKay (a prior attorney representing Wahl), Marsha stated that she did not have a contract with McKay and did not attend any meetings with McKay and Wahl but may have written a check to her firm. (Doc. 73-3 at 44-45 (94: 16-95: 21)). Similarly when asked about her interactions with Jeannette Berry, another lawyer representing Wahl, Marsha stated that she might have been at a meeting with Wahl and Berry, but she was not party to a contract with her, did not attend any meetings with Berry alone, and noted that any payment, if made, would have been from the family trust. (Doc. 73-3 at 46-47 (96: 14-97: 25). Marsha did admit, when shown specific emails from 2016, that she had email correspondence with both McKay and Berry about issues relating to the ongoing allegations of sexual abuse in March 2016 and June 2016, respectively. (Doc. 73-3 at 54-62).

Eric Fendler initially introduced Wahl to Keeley McKay as he had previously been working with McKay. (Doc. 73-4 at 15 (82: 3-11)). He understood that McKay was just helping Wahl until they could find an attorney with more experience who would be able to better assist her. (Doc. 73-4 at 19 (86: 5-11)). When he had contact with McKay, it would primarily be for financial reasons. (Doc. 73-4 at 19 (86: 12-23)). Eric did not get involved with the legal strategy, and

characterized it as "Erica was driving the bus. I was just riding." (Doc. 73-4 at 19-20 (86: 23-87: 1)). Eric did not have any role in introducing Wahl to her subsequent attorneys, Jeannette Berry, Marta Farmer, Janell Guge, Shelly Jared or Michelle Sullivan. (Doc. 73-4 at 21-25). He did attend a mediation with Wahl and Michelle Sullivan, but that was to support Wahl and to determine if Borchardt would be paying Eric money that Eric believed was owed to him. (Doc. 73-4 at 25-26 (92: 10-93: 17)). Wahl, Eric and Marsha did ask McKay, in 2015, to draw up an acknowledgement of debt regarding legal fees expended in the dissolution case. (Doc. 73-4 at 37). Eric also played a role in exchanging property that was part of the property settlement portion of the dissolution in 2016. (Doc. 73-4 at 40-56). Through the family trust, Eric also paid the fees for attorneys used by Wahl throughout the dissolution and custody proceedings, but those fees were deducted from Wahl's ultimate inheritance that she would receive from her parents. (Doc. 73-4 at 38 (130: 12-20) and 83 (227: 3-7)).

After being served with this lawsuit, Eric was served with Plaintiff's First Set of Combined Discovery Requests on May 7, 2025. (Doc. 75-2). In the requests, Eric was asked broadly to produce any and all communications from January 1, 2015 to present related to a number of issues, including but not limited to the multiple lawsuits involving Borchardt and Wahl, Wahl's prior attorneys, any evidence Eric intended to use at trial, any allegations of physical and sexual abuse by Borchardt

involving any of Eric's grandchildren, and Fendler's financial status. (Doc. 75-2 at 9-14). Eric took screenshots of text messages that were responsive to the requests and sent them to Lynette Wilsey, a paralegal at his attorney's office. (Doc. 91-1 at ¶ 2). After sending the screenshots, Eric deleted a number of old texts and emails, including an exchange with Wahl, because he believed the screenshots had been adequately produced to his attorney. (Doc. 91-1 at ¶ 3). Eric estimated that the deletion took place approximately two or three months before he was deposed, which was on December 11, 2025. (Doc. 75-6 at 16-17 (194: 12-195: 25). At that time, he also changed his Signal app settings to "disappear" after 24 hours.

However, Eric later learned that some of the screenshots had been cut off and did not contain the full texts. (Doc. 91-1 at ¶ 4). Eric did not know some of the texts had been cropped in the screenshots before he deleted them from his phone. (Doc. 91-1 at ¶ 7). Eric tried to recover the deleted messages himself, and when that did not work, tried working with the messaging app to recover them, to no avail. (Doc. 91-1 at ¶ 5). Ultimately, Eric retained ArcherHall, a forensic computer firm, to attempt retrieval but it was not successful. (Doc. 91-1 at ¶ 6 ; Doc 91-3 at 1).

Wahl was also served discovery requests on May 7, 2025, with similar requests for production for a broad swath of communications from January 1, 2015 to present, relating to issues of alleged physical and sexual abuse by Borchardt of a

number of children, legal proceedings related to those allegations, and financial records. (Doc. 75-1). Although Wahl initially responded that information was being compiled, she later admitted that she set her Signal messaging application to automatically delete her messages and stated she did not feel she had to produce private conversations with her father. (Doc. 75-7 at 8-9 (145: 22-146: 14)). She further admitted she had manually deleted texts related to exchange of custody of WB and that although she had produced texts in the underlying dissolution case per Standing Master Bowen's direction, she subsequently switched to auto-delete of text messages. (Doc. 75-7 at 11-12 (165: 8-166: 6); 13-14 (175: 16-176: 3)).

## II. Discussion

### A. Discovery Sanctions

Borchardt has moved the Court for sanctions against Erica Wahl and Eric Fendler "for their intentional deletion of text communications that should have been preserved for discovery in this litigation." (Doc. 75 at 1).

Electronic discovery is governed by Fed. R. Civ. P. 37(e), which states:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> > (A) presume that the lost information was unfavorable to the party;
> > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> >
> > (C) dismiss the action or enter a default judgment.

Rule 37(e), if applicable to the loss of evidence at issue here, supplants the Court's "inherent authority" to fashion sanctions for failing to preserve electronically stored information. *Gregory v. State of Montana*, 118 F.4th 1069, 1080 (9th Cir. 2024).

Spoliation sanctions for a violation of Rule 37(e) are available only if three threshold elements are met: ESI which should have been preserved is lost or unavailable because a party failed to take reasonable steps to preserve it, and the lost ESI cannot be restored or replaced through additional discovery. If those elements are established, "the Rule forks down two paths." *Hampton v. Hernandez*, 2026 U.S. Dist. LEXIS 72285, * 3 (D. Alaska, April 2, 2026). If the spoliation is accidental or unintentional, but still results in prejudice to the other party, the Court may only order "measures no greater than necessary to cure the prejudice." *Hampton*, * 3 (citing Fed. R. Civ. P. 37(e)(1).

However, if the destruction of evidence was done with the intent to deprive the other party of that information, the Court may issue more serious sanctions,

including an adverse inference to the jury or a default judgment on liability. *Hampton*, *3 and Fed. R. Civ. P. 37(e)(2). Terminating sanctions under Rule 37(e)(2) should be imposed only when "lesser sanctions are insufficient to address the loss of the ESI." *Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024). ESI-related spoliation sanctions are not available when the party took reasonable steps to preserve the evidence, even if ultimately the evidence has been lost. *Hampton*, * 4-5.

Although the rule itself does not define "intent to deprive," it is understood to "involve[e] the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party." *Jones*, 95 F.4th at 735. "Because intent can rarely be shown directly, a district court may consider circumstantial evidence in determining whether a party acted with the intent required for Rule 37(e)(2) sanctions." *Jones*, 95 F.4th at 735. Things a court may consider "include the timing of destruction, affirmative steps taken to delete evidence, and selective preservation." *Jones*, 95 F.4th at 735. When deciding on a spoliation sanction, the Court is mindful that sanctions are both remedial and punitive, in that they restore the prejudiced party to the "level playing field" that existed without the spoliation and also punish the spoliator and deter "other potential litigants that this type of behavior will not be tolerated." *Praecipio Consulting, LLC v. Howser*, 2026 U.S. Dist. LEXIS 177361, * 27 (N.D. Cal. July 20, 2026).

Borchardt requests the Court enter default judgment against both Eric Fendler and Erica Wahl on all claims in his first amended complaint, arguing that they intentionally destroyed ESI, specifically text messages, relevant to the claims he has made in this case. To do so, the Court must find that Eric and Wahl failed to take reasonable steps to preserve their text messages, those messages cannot be restored or replaced, and must find that Eric and Wahl acted with the intent to deprive Borchardt of the use of the text messages in this litigation. Finally, the Court must also find that lesser sanctions would be insufficient to address the loss of the text messages.

As to Eric, it is undisputed that he produced screen shots of his texts with Wahl to his lawyers and then deleted them, believing the screen shots had been accurately saved in toto. (Doc. 91-1 at ¶¶ 2-3). Eric was not aware some of the screenshots cut off part of the texts until he was informed as such by a paralegal at his attorney's office. (Doc. 91-1 at ¶ 4). He then embarked on several attempts to retrieve the missing segments, including using an application purporting to retrieve deleted messages, contacting the messaging application (Signal) to see if it could retrieve the messages, and finally (through counsel) retaining a forensic computer firm to retrieve the deleted segments, all to no avail. (Doc. 91-1 at ¶¶ 5-6). Although it is apparent that the text segments have been lost and additional discovery will not recover them, Eric took reasonable steps to preserve the

evidence and, as in *Hampton*, an unintentional error in the preservation process resulted in the loss of evidence. Because Eric took reasonable steps to preserve the texts, spoliation sanctions are not warranted against him.

Conversely, Wahl took no steps whatsoever to retain text messages arguably responsive to Borchardt's discovery requests. Although it does appear from the parties' briefing that Wahl's text messages were produced in the underlying custody dispute as of January 15, 2024 (Doc. 90-3 at 5-6), in February 2024, Wahl re-set her messaging application to delete outgoing messages after they were sent, and to delete incoming messages after they were read. (Doc. 90-1 at ¶1). Wahl further claims that she did not know Borchardt was going to file this lawsuit until she was served in November 2024, and that she stopped texting her family members about matters related to this case after this lawsuit was filed. (Doc. 90-1 at ¶¶ 2-3).

Borchardt's discovery requests to Wahl, dated May 7, 2025, seek production of any and all communications between Wahl and the remaining Defendants in this case "that pertain to or discuss or mention District of Montana Case No. CV-24-199-BU-KLD; District Court of Wyoming Case No. 23-CV-0021; the Plaintiff; Gallatin Co. Cause No. DR 15-275B; or the Plaintiff's children: W.R.B., A.J.B., and B.K.B. since January 1, 2015." (Doc. 75-1 at 9-11). Assuming without concluding that Wahl did not know of this lawsuit prior to being served, she still

would have been obligated to produce responsive communications from November 2024 forward. Although Wahl stated that she did not text family members about matters related to this lawsuit, Borchardt has provided the Court with texts from Eric's production from June 6, 2024 to approximately January 8, 2025, that appear to discuss ongoing disputes over the transfer of the children, child support obligations, the apparent settlement of a Wyoming case involving an allegation of child abuse, and the existence of this lawsuit. (Doc. 75-5). At the very least, this calls into question Wahl's assertion that she no longer discussed matters related to issues in this lawsuit once she was served. Wahl herself admitted that she manually deleted texts because she did not want Borchardt's lawyer to have access to them. (Doc. 75-7 at 11-12 (165: 20-166: 7).

The Court finds that Wahl should have preserved her texts responsive to the discovery requests, she took no reasonable steps to preserve them, and her destruction of the texts was intended to deprive Borchardt of their information. Accordingly, Borchardt is entitled to a sanction pursuant to Fed. R. Civ. P. 37(e)(2). However, after considering the sanctions available, the Court declines to enter a default judgment against Wahl and will instead instruct the jury that it may presume the contents of the texts were unfavorable to Wahl. The Court finds this is the appropriate sanction given the fact that the texts in question long post-date the actual allegations of improper legal proceedings in Borchardt's first amended

complaint and Borchardt's counsel admitted at oral argument that the destruction of the texts related more to whether Eric, Marsha and Theresa could be subject to liability on Borchardt's claims than to whether Wahl and Sarah Fendler had probable cause to initiate the legal proceedings in 2022. The Court also finds that Borchardt is entitled to reasonable attorney fees and costs related to the motion for discovery sanctions

**B. Summary Judgment**

Under Rule 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Once the movant has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate by affidavits, depositions, answers to interrogatories or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986).

"The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S.

at 247–48 (emphasis in original). The non-moving party may not rest upon the mere allegations or denials of the pleadings. *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249–50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020–21 (9th Cir. 2007). However, conclusory or self-serving statements "are insufficient to create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (citation omitted).

**1. Malicious Prosecution**

"A malicious prosecution begins in malice, without probable cause to believe the action can succeed, and finally ends in failure." *Plouffe v. Mont. Dep't. of Pub. Health & Human Servs.*, 45 P.3d 10, 16 (Mont. 2002), citing *McGuire v. Armitage*, 603 P.2d 253, 255 (Mont. 1979). To prevail on a claim for malicious prosecution, a plaintiff must establish each of the following elements:

(1) a judicial proceeding was commenced and prosecuted against the plaintiff;

(2) the defendant was responsible for instigating, prosecuting or continuing such proceeding;

(3) there was a lack of probable cause for the defendant's acts;

(4) the defendant was actuated by malice;

(5) the judicial proceeding terminated favorably for plaintiff; and

(6) the plaintiff suffered damage.

*Plouffe*, 45 P.3d at 16 (citations omitted). The Montana Supreme Court has adopted the definition of probable cause from the Restatement (Second) of Torts, § 675 (1977), which states:

> One who takes an active part in the initiation, continuation or procurement of civil proceedings against another has probable cause for doing so if he reasonably believes in the existence of the facts upon which the claim is based, and either
>
> (a) correctly or reasonably believes that under those facts the claim may be valid under the applicable law, or
>
> (b) believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge and information.

*Hughes v. Lynch*, 164 P.3d 913, 918 (Mont. 2007). The determination of probable cause is made under an objective standard, and "must be submitted to the jury for resolution when direct and circumstantial evidence related to the defendant's knowledge is susceptible to different conclusions by reasonable persons." *Plouffe*, 45 P.3d at 11-12. Probable cause is only a question of law susceptible to summary judgment "when, based on the totality of the circumstances, 'no evidentiary conflict exists and the uncontroverted evidence admits only one conclusion.'"

*McCauley v. Crowley Fleck, PLLP*, 505 P.3d 844, ¶ 14 (Mont. 2022), citing *Plouffe*, 45 P.3d at 12.

A party who encourages or advises another party "to bring proceedings that the third person already has in contemplation, does not thereby procure the institution of the proceedings." Restatement (Second) of Torts § 653 (1977), cmt. f. *See also* Restatement (Second) of Torts § 674 (1977), cmts. b and c (adopting same standard for initiating and continuing civil proceedings). Additionally, "[t]he act of providing information to authorities without more is not actionable." *Vehrs v. Piquette*, 684 P.2d 476, 478 (Mont. 1984).

**a. Eric Fendler, Marsha Fendler and Theresa Ohl**

It is undisputed that no legal process or filings were made by Eric, Marsha or Theresa. Instead, Borchardt's claims for malicious prosecution for these individuals relies on the theory that each of them "instigated, prosecuted and continued the legal proceedings described in Counts 1 through 5" of the First Amended Complaint. (Doc. 73-1 at ¶¶ 8, 9, and 10). He claims that each of them "work[ed] with other Defendants on a strategy to malign [him]." (Doc. 73-1 at ¶¶ 8, 9 and 10). The largely boiler-plate allegations state each of these Defendants falsified allegations of sexual abuse by three children and ensured "as many people as possible became aware of those false episodes" and reported these allegedly

false episodes to law enforcement in an effort to have a prosecution brought. (Doc. 73-1 at ¶¶ 8, 9 and 10).

As to Eric and Marsha, Borchardt additionally alleges that they directed Wahl and her counsel as to litigation strategy, funded her dissolution proceedings with money from the Fendler family trust, funded the Wyoming sexual abuse litigation involving Ben and Elaine Henry, and hired a private investigation firm to investigate him. (Doc. 73-1 at¶¶ 8 and 10). Borchardt also alleges that Theresa and Marsha coached the children regarding their disclosure of sexual abuse by Borchardt, and that Theresa was a primary care medical professional for his children. (Doc. 73-1 at ¶¶ 9 and 10).

As noted by the Defendants, however, Borchardt's allegations are simply conclusory statements, without any evidence of instigation or continuation of the actual allegations of malicious prosecution, namely the filing of the orders of protection by Wahl and Sarah Fendler. When determining whether Eric, Marsha or Theresa instigated, prosecuted or continued any of the instances of malicious prosecution, the Court must first determine what the actual "judicial proceeding" is alleged to have been filed or instituted. Here, there are very specific allegations of malicious prosecution: Sarah Fendler's April 10 and April 14, 2022, petitions for orders of protection and Erica Wahl's December 23, 2022, petition for an order of protection and emergency motion to adopt a proposed emergency interim parenting

plan. Other than his conclusion that Eric, Marsha and Theresa "instigated, prosecuted and continued" the legal proceedings, none of the allegations in Borchardt's declaration provides evidence that any of these Defendants acted with the requisite involvement to give rise to liability for malicious prosecution.

To be fair, Marsha, Theresa and Eric filed equally conclusory declarations, in which they stated they "did nothing to instigate, prosecute, or continue the legal proceedings described in Counts 1 through 5 of Plaintiff's First Amended Complaint." (Doc. 60-2 at ¶ 5; Doc. 60-5 at ¶ 4; Doc. 60-6 at ¶ 2). Leaving aside the self-serving, conclusory statements from all parties, however, and viewing the evidence in the light most favorable to Borchardt, there is still no evidence that Marsha, Theresa or Eric initiated or continued the filing of the legal proceedings which form the basis of Borchardt's claims.

Borchardt argues that the family members discussed the litigation and the allegations of abuse made by the children, and that both the Borchardt/Wahl dissolution litigation and the federal Wyoming sexual abuse litigation were funded from the Fendler family trust. He also claims that Eric and Marsha communicated directly with a few of Wahl's dissolution attorneys and that they "directed" the litigation. However, despite Borchardt's conclusion that this conduct amounts to "directing" litigation, the facts he alleges do not establish control, direction or initiation of the legal proceedings for which he has brought malicious prosecution

claims. The contact with Erica's attorneys was sporadic at best, and the funding of the litigation was made from Wahl's portion of her family inheritance. Even if Eric and Marsha had paid for the dissolution case, however, it is still not indicative of control of the litigation, including the December 2022 filings by Wahl that give rise to Counts 2 and 4.

The case for liability for Eric, Marsha and Theresa for Count 1 is even less tenable. There is simply nothing in the record to indicate they were involved in any way in Sarah Fendler's petitions for TOPs on April 10 and 14, 2022. Even Wahl did not know that Sarah was going to file the petitions:

> Q. Do you—are you aware of your sister-in-law Sarah getting a TOP—a temporary order of protection in Bridger also in April of 2022?
>
> A. I am aware.
>
> Q. Okay. And are you aware that that occurred on a Sunday?
>
> A. Yeah, I found out about it after it happened.
>
> * * *
>
> Q. And you said you didn't have any knowledge of her—or did she tell you before she was going to go get the ---the temporary order of protection in Bridger?
>
> A. She did not.
>
> Q. How did you find out that there was a temporary order of protection in Bridger?
>
> A. She texted me and told me.

(Doc. 73-2 at 76; 78 (124: 7-14; 126: 14-21)). Sarah Fendler asserts that she applied for the TOPS in April 2022 because WB disclosed to her that his father, Borchardt, had touched him inappropriately. (Doc. 60-3 at ¶ 3). There are simply no facts to support a conclusion that anyone other than Sarah was involved in the procurement of the TOPS in April of 2022.

Because Borchardt cannot establish that Eric Fendler, Marsha Fendler or Theresa Ohl initiated, controlled or continued the legal proceedings forming the basis of Counts 1, 2 and 4, these Defendants are entitled to summary judgment on these claims.

**b. Sarah Fendler**

Sarah Fendler seeks summary judgment on the malicious prosecution claims against her, arguing that Borchardt cannot establish a lack of probable cause as to the April 2022 TOP petitions she filed (Count 1) and that he cannot establish that she instigated, prosecuted or continued the legal processes filed by Erica in December 2022 (Counts 2 and 4). The Court agrees that Borchardt has no evidence that Sarah Fendler was involved in the December 2022 filings by Erica, and Sarah is entitled to summary judgment on Counts 2 and 4. However, the Court finds there are genuine disputes of fact about whether Sarah Fendler had probable cause to file the TOP petitions in April 2022.

Although Sarah argues that the fact that there were apparently multiple disclosures of sexual abuse allegations by several children to multiple adults establishes probable cause, Borchardt notes that there is also evidence of coaching, which is essentially when adults coach or instruct children to make allegations of abuse. Whether the reports were valid and reasonably relied upon by Sarah, or the result of extensive coaching and thus not reliable, is a dispute for the jury to determine. Additionally, to the extent that Sarah relies on the issuance of the TOPs by the judge as evidence of probable cause, there are genuine issues of fact if the reports made were reliable and whether it was reasonable under the circumstances for Sarah to make them, given the evidence Borchardt will present of potential coaching. If the reports were invalid or suspect, but presented to the judge, that could be viewed by the jury as raising serious questions about whether there was probable cause to seek the TOPs. Ultimately, credibility and factual issues remain the province of the jury, and so summary judgment is not appropriate on Count 1 as to Sarah Fendler.

**c. Erica Wahl**

The malicious prosecution counts specifically against Erica Wahl (Counts 2 and 4) involve the December 2022 Broadwater TOP and the simultaneous emergency motion to adopt Wahl's proposed parenting plan filed in the dissolution case in Gallatin County. Wahl seeks summary judgment on all malicious prosecution

counts arguing that Borchardt cannot establish a lack of probable cause and on Count 1 specifically because there is no evidence that she instigated, prosecuted or continued Sarah Fendler's April 2022 petitions for TOPs. As with Sarah's motion, the Court agrees there is no evidence that Wahl was involved in any way with Sarah's April 2022 petitions, and in fact Wahl testified under oath that she was unaware of them until after they had been filed and Sarah texted her to state as such. Accordingly, Wahl is entitled to summary judgment on Count 1.

However, the Court agrees there are genuine issues of fact about whether Wahl had probable cause to file her December 2022 Broadwater TOP petition and the emergency motion to adopt her parenting plan. Wahl argues that the issue is not ultimately whether the children's disclosures were accurate, but whether it was reasonable to believe in the possibility that the disclosures were accurate and thus the claim, or proceeding, valid and based in probable cause. (Doc. 82 at 20, citing Restatement (Second) of Torts, § 674, cmt. e). This is an accurate characterization of probable cause to bring a civil action, but Wahl's reliance on this tenet misses the point: if there are issues of fact about the reasonableness of believing the children's accounts based on evidence of coaching and credibility of witnesses, the jury should be the arbiter of whether there was probable cause, not the Court. For these reasons, summary judgment is not appropriate for Erica Wahl on Counts 2 and 4.

**2. Abuse of Process**

Borchardt alleges Wahl falsely represented to the Broadwater County Justice Court that the Gallatin County dissolution case was no longer pending, thus resulting in the Justice Court issuing the TOP before Borchardt's holiday visitation with his children. (Doc. 8 at 8-9). He alleges the purpose of filing the petition for the TOP in the wrong jurisdiction and venue was to provide the basis for approaching the Gallatin County court to amend the parenting plan. (Doc. 8 at 8-9).

Abuse of process is "us[ing] process to coerce the [party] to do some collateral thing which he could not be legally and regularly compelled to do." *Roaring Lion Ranch, LLC v. YC Properties*, 586 P.3d 278, 284 (Mont. 2026) (citations omitted). "The elements of an abuse of process claim are an ulterior purpose and a willful act in the use of process not proper in the regular conduct of the proceeding." *Seipel v. Olympic Coast Invs.*, 188 P.3d 1027, 1031 (Mont. 2008). There is no liability for simply carrying out a valid legal process to the authorized conclusion, even if the party does so with bad intentions. *Hughes*, 164 P.3d at 919 (citing Prosser, *The Law of Torts*, § 121 at 857 (4th ed., West 1971). However, when the process is used as a club or threat to compel an action which would not otherwise be performed, an abuse of process has occurred. *Salminen v. Morrison & Frampton, PLLP*, 339 P.3d 602, 610 (Mont. 2014). It is also an abuse of process to "harass litigation

opponents by clearly wrongful conduct." *Meyer v. Big Sky Resort*, CV-18-02-BU-BMM (D. Mont. September 17, 2019) at *3-4, citing Dan B. Dobbs et al., *Dobbs' Law of Torts* § 594 (2d ed. June 2019 Update). *See also Hopper v. Drysdale*, 524 F.Supp. 1039 (D. Mont. 1981) (a valid deposition notice could nonetheless be the basis of an abuse of process claim when it was improperly used to lure a person into a jurisdiction for the purpose of his arrest).

Under Mont. Code Ann. § 40-15-301(2), when there is a pending dissolution or parenting action, the appropriate jurisdiction and venue for an Order of Protection is the court in which the dissolution or parenting action is pending, unless that judge is unavailable or the person seeking the protection has fled the county to escape abuse. In Wahl's application for a TOP for her daughter, AB, against Borchardt, she omitted the fact that there was a currently pending parenting action in Gallatin County District Court, which would have indicated to the Justice Court in Broadwater County that it did not have jurisdiction to enter a TOP. In her emergency motion to amend the parenting plan in Gallatin County District Court, Wahl asked the Court to deny Borchardt contact or visitation with AB until there was an investigation of the allegations forming the basis of the TOP. (Doc. 8-10 at 8). While Wahl describes the omission of the pending dissolution as a reasonable mistake and the subsequent use of the TOP in the request to amend the parenting

plan as "litigation strategy disputes"(Doc. 82 at 28), a reasonable jury could find otherwise. Accordingly, summary judgment is not appropriate on Count 3.

### 3. Intentional and Negligent Infliction of Emotional Distress

In Counts 6 and 7, Borchardt alleges intentional and negligent infliction of emotional distress from the filing of the petitions for the TOP and the motion to amend the parenting plan.[3] Borchardt alleges both counts against all Defendants, asserting that all Defendants instigated, prosecuted and continued the filing of the documents giving rise to his emotional distress. For the reasons stated above, the Court finds that Borchardt has not established that Eric, Marsha or Theresa instigated, prosecuted or continued the legal actions alleged in the First Amended Complaint, and so they are entitled to summary judgment on Counts 6 and 7. Similarly, Wahl and Sarah are entitled to summary judgment on Counts 6 and 7 to the extent that any liability for those counts relates to the filings of legal documents they did not personally file.

Montana recognizes the torts of intentional and negligent infliction of emotional distress when there is "a showing the plaintiff suffered 'serious' or 'severe' motional distress as the reasonably foreseeable consequence of the defendant's act or omission." *Puryer v. HSBC Bank USA, N.A.*, 419 P.3d 105, 115 (Mont. 2018),

---

[3] To the extent Counts 6 and 7 also allege liability based on the allegations in Count 5, which Borchardt has dismissed, all Defendants are entitled to summary judgment.

citing *Sacco v. High Country Indep. Press*, 896 P.2d 411, 428 (Mont. 1995). For the emotional distress to be serious or severe, it "must be 'so severe no reasonable person could be expected to endure it.'" *Feller v. First Interstate Bancsystem, Inc.*, 299 P.3d 338, 344 (Mont. 2013), citing *Sacco*, 896 P.2d at 426. "The intensity and duration of the distress are important factors in evaluating whether the alleged emotional distress is truly serious and severe." *Feller*, 299 P.3d at 345, citing *Czajkowski v. Meyers*, 172 P.3d 94, 102 (Mont. 2007) (finding evidence of severe emotional distress where the offending behavior was "indecent, atrocious and utterly intolerable in a civilized society"). Where physical manifestation accompanies the emotional distress, such as post-traumatic stress syndrome, it generally establishes the emotional distress suffered is "genuine and severe." *Feller*, 299 P.3d at 345, citing *Henricksen v. State*, 84 P.3d 38, 55 (Mont. 2004). However, when there is not substantial evidence establishing the physical manifestation of severe emotion distress claimed by the plaintiff, the Court properly grants summary judgment on those claims. *Feller*, 299 P.3d at 345-46 (no evidence to support claims of anxiety attacks, severe headaches, sleeplessness and shoulder pain).

In his deposition, Borchardt described having stress and anxiety about his visitation rights with his children, having multiple sleepless nights worrying about whether his children will visit him, and having sporadic episodes of high blood

pressure. (Doc. 62-1 at 6-19). When asked about the severity of his emotional distress, he described it as follows:

> Q. You have been able to endure it, correct?
>
> A. Still here.
>
> Q. Are you taking medication for it?
>
> A. No.
>
> Q. Are you seeing a counselor---
>
> A. No.
>
> Q. --for it? No?
>
> A. No.
>
> Q. Are you seeing a priest or minister or anything on a regular basis to talk about this distress or stress?
>
> A. I—I've had conversations with pastors at times when I'm in church.
>
> Q. How many?
>
> A. I have a couple conversations a year, probably.

(Doc. 62-1 at 17-18 (193: 15-194: 6). However, in his declaration offered in opposition to summary judgment, Borchardt states that he additionally suffers from panic attacks, post-traumatic stress disorder, physical pain from the emotional distress, and would receive treatment for anxiety with a therapist but cannot do so in part because of the distance to a therapist and also "due to the financial strain

Defendants' conduct has caused" him. (Doc. 73-1 at 8). He elaborates on the 27 causes of this additional stress in paragraphs 13a-aa, although none of those paragraphs relate to the actual allegations of malicious prosecution or abuse of process. (Doc. 73-1 at 6-7, listing numerous generalized issues including fear of future issues with child custody and visitation, fear related to the hiring of a private investigator in the Wyoming litigation, guilt and stress over his children not currently spending enough time with his side of the family and emotional issues relating to not knowing his children's current school progress or medical needs).

Borchardt's own briefing demonstrates that his claims for emotional distress are not based on the allegations of malicious prosecution and abuse of process in Counts 1-4, but are instead the result of "an 'unrelenting barrage' of false and horrific allegations by Defendants for over a decade . . ." (Doc. 73 at 29). Borchardt cites *Czajkowski* for the proposition that such conduct, if proven, can form the basis for an independent tort of intentional or negligent emotional distress, and the Court agrees. However, the claims actually pleaded by Borchardt are not that he was subjected to a barrage of abuse for a decade: he specifically limited his claims for emotional distress to the April and December 2022 filings, and he has failed to provide evidence to establish that those filings resulted in serious and severe emotional distress as required by *Feller* and *Sacco*. Accordingly, Counts 6 and 7 fail as a matter of law.

## III. Conclusion

For the reasons discussed above,

IT IS ORDERED that Borchardt's motion for discovery sanctions is denied as to Eric Fendler and granted as to Erica Wahl. In his proposed jury instructions, Borchardt shall include an instruction directing the jury to presume that the destroyed text messages were unfavorable to Wahl. Borchardt is entitled to reasonable attorney fees and costs in bringing the motion for discovery sanctions, and shall submit an affidavit of fees and costs by October 16, 2026. Wahl shall have until October 30, 2026 to submit any objections to the fees and costs sought.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment is GRANTED in part and DENIED in part, as follows:

1. Defendants Eric Fendler, Marsha Fendler, and Theresa Ohl are granted summary judgment on all claims against them and are dismissed from this lawsuit.
2. Defendant Sarah Fendler is granted summary judgment on Counts 2, 4, 6 and 7.
3. Defendant Erica Wahl is granted summary judgment on Counts 1, 6 and 7.
4. Summary judgment is denied in all other respects as described above.

Trial will proceed on Count 1 against Sarah Fendler and Counts 2, 3 and 4 against Erica Wahl. The Court will set a scheduling conference for new trial deadlines by separate order.

DATED this 28th day of September, 2026.

Kathleen L. DeSoto
United States Magistrate Judge